IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION |
| v. | ) | |
| | ) | 05-CR-10239-RCL-17 |
| JERMAINE GILMORE | ) | |
| | ) | |

**UNITED STATES' OPPOSITION
TO DEFENDANT'S MOTION TO SEVER**

The government respectfully submits that defendant JERMAINE GILMORE's ("defendant") motion to sever should be denied. Defendant has failed to demonstrate actual prejudice that would necessitate a severance. A separate trial, moreover, is not practical due to overlapping evidence.

### I. FACTS

**A.   Background of Investigation**

In or about September 2004, the Boston Police Department ("BPD") and the U.S. Drug Enforcement Administration ("DEA") began an investigation of the drug trafficking activities of Husie A. Joyner, Gregory R. Bing and others based on information from a DEA cooperating source ("CS"). The CS told agents that the CS had purchased crack cocaine from Joyner, the leader of the group, on at least three occasions. After those three sales, the CS stated that Joyner had directed the CS to obtain the crack cocaine from House and Bing.

Thereafter, between September 24, 2004 and January 11, 2005,

1

the CS, under the direction and control of the DEA and members of the BPD Special Investigations Unit ("SIU"), made a series of six controlled purchases of cocaine and crack cocaine from BING and Husie Joyner.  During one of these controlled purchases, the driver of vehicle was defendant JERMAINE GILMORE.

**B.    Controlled Purchase of Crack Cocaine Involving GILMORE**

On October 5, 2005, the CS made a controlled purchase of 61.7 grams of cocaine base ("crack") from BING in the area of Bing's residence at 751 Shawmut Avenue in Roxbury.  The transaction took place in a white Chevrolet Impala which had been rented by GILMORE.  The CS entered the vehicle and Bing introduced the driver of the vehicle (GILMORE) as "Calvin."  Bing gave the CS the crack cocaine as GILMORE sat in the driver seat.

**C.    Intercepted Calls Involving GILMORE**

After the initiation of wiretaps on Bing's phone in April 2005, GILMORE was intercepted on the wiretap talking to Bing about purchasing thousands of dollars worth of cocaine and "cooking" (manufacturing) crack cocaine.  In particular, after incurring a debt of about $15,000 from two separate drug transaction with Bing, GILMORE asked Bing for specific instructions on how to cook the cocaine into crack cocaine in order to make more money.  GILMORE's participation in the conspiracy was ended only when he was arrested on a federal supervised release violation on May 24, 2005.

For example, during a call on April 23, 2005, GILMORE told Bing that he had "3 dollars" ($3,000) for Bing. Bing complained that it should be "7 dollars." Days later on April 26, 2005, law enforcement agents observed a male (who was later identified as GILMORE) who was driving a black Yukon GMC Denali meet with Bing at a carwash in Roxbury.

During a call on April 28, 2005, at 3:32 p.m., GILMORE complained that Bing did not call him back and GILMORE said he did not like to be sitting around "all this time I got [] change (money) on me." GILMORE said, "I don't like holding my f*cking paper (money) like that man, you know?" The next day, following several calls on April 29, 2005, agents observed GILMORE meet again with Bing at the same carwash in Roxbury in order to give Bing more money and a scale. After the meeting, agents followed GILMORE as he drove off in the same black Yukon GMC Denali. A marked BPD cruiser conducted a traffic stop of the vehicle and identified GILMORE as the driver and sole occupant. The same evening, Joyner instructed Bing to mix the "250" with the "125" (grams of crack cocaine). Bing told Joyner he was using a "joint" (scale) that "Maine" (GILMORE) had given him. The next day, during an intercepted call with Joyner on April 30, 2005, Bing told Joyner that he was in the truck with "Maine" (GILMORE) and would be over to see Joyner in a few minutes.

During a call on May 6, 2005, at 6:22 p.m., Bing and GILMORE

talked about a drug debt that GILMORE owed Bing, for a total of about $15,000. Bing said, "Listen..11...you in the hole for 15 dollars already...right...eleven 11 ($11,000) for that thing you got...and four 4 ($4,000) for the other thing, right?" Bing then asked GILMORE how many "grizzes" (grams) he had: "You got 75 joints there....75 grizzies, right?" GILMORE answered, "it's 72 (grams) whatever.." Bing then suggested that GILMORE have his man "burn it down" (cook it into crack), because Bing didn't have time to do it and give him (Bing) back "22" ($2,200). The same day on May 6, 2005, at 7:05 p.m., GILMORE called Bing and asked Bing for specific instructions on how to cook the cocaine into crack.

For example, during the call, Bing said, 'When the water boils all the way hot, hot, hot . . . Pour it in a drop, right, like a glass pot so you can see. Right. A little bit, like about, like about an 8 inch high, you understand what I am saying.' Later Bing said, 'Bake.. like 12 tell him to take 12 grams of bako (baking powder) right, put it in the same bag with that shake it up right and then like when he pours, when he pours the inch water in another pot, tell him to put that joint, tell him to put that, um put that um that stuff in the pot and stir it right, stir it. Tell him do not put no more water in the pot, tell him to stir it. Stir it, stir it, stir it.' GILMORE then said, 'Why don't you tell him that if he can't do I just wait.

I'd rather wait, I don't want to mess it up.'

## II.  ARGUMENT

Defendant should not be severed from the other co-defendants in this case because GILMORE cannot meet his heavy burden of making a "strong showing of prejudice" if forced to proceed to trial with the other defendants.  United States v. Rawwad, 807 F.2d 294, 295 (1st Cir. 1985) (internal quotation marks and citations omitted).  The First Circuit has repeatedly endorsed the general rule that "persons who are indicted together should be tried together."  United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993).  That is because joint trials "promote efficiency and serve the interests of justice."  Zafiro v. United States, 506 U.S. 534, 537 (1993) (internal quotation marks and citation omitted).  The presumption in favor of joint trials is particularly strong in conspiracy cases such as this one.  See United States v. Brandon, 17 F.3d 409, 440 (1st Cir. 1994) ("In the context of conspiracy, severance will rarely, if ever, be required.") (internal quotation marks and citation omitted); United States v. Perkins, 926 F.2d 1271, 1280 (1st Cir. 1991) ("Co-conspirators are customarily tried together absent a strong showing of prejudice.").

Accordingly, "[t]o obtain severance, [a defendant] must show actual prejudice resulting from the joinder . . . not merely that he would have a better chance of acquittal if" severance were

5

granted.  United States v. L'Allier, 838 F.2d 234, 241 (7th Cir. 1988).  "Actual prejudice means that the defendant could not have a fair trial without severance."  United States v. Balzano, 916 F.2d 1273, 1281 (7th Cir. 1990).  Indeed, because of the strong preference for joint trials, denial of a severance motion will be reversed "only if the district court's decision deprived defendant of a fair trial, resulting in a miscarriage of justice."  United States v. Brennan, 994 U.S. 918, 924 (1st Cir. 1993) (internal quotation marks and citation omitted); United States v. Tejeda, 974 F.2d 212, 219 (1st Cir. 1992) (same).

In this case, defendant has not overcome his burden of demonstrating that a joint trial with the other co-defendants will result in actual prejudice.  First, defendant's factual characterization is incorrect. As indicated in the produced discovery, including DEA 6 reports and wiretap affidavits, GILMORE was present with Bing during one of the controlled purchases of cocaine in October 2004.  Therefore, contrary to defendant's assertions, GILMORE's participation in the conspiracy is certainly greater than a one month period.

Second, GILMORE is not in an unique position.  While it is true that his participation in the conspiracy was cut short by his arrest in May 2005, GILMORE was also one of multiple wholesale cocaine and crack cocaine customers who redistributed the crack cocaine that Bing and Joyner sold on the streets of

6

Boston. Therefore, a separate trial for GILMORE would require a duplication of the evidence regarding the controlled purchases of cocaine and crack cocaine, the authentication of the wiretap, and other seizures of cocaine and crack cocaine that will demonstrate the meaning of code/slang words like "grizze" and truncated references to drug debt/price numbers which GILMORE, Bing, and other conspirators utilized.

Finally, defendant's argument that he may be forced to endure a long trial is unavailing. Motions to suppress are still pending, and it still remains to be seen which, if any, defendants will be seeking a trial. Moreover, the case-law's preference for a joint trial deals with the efficiencies of judicial resources, not individual (albeit scare as well) resources.

### III. Conclusion

Accordingly, defendant's motion for a severance should be denied.

Respectfully Submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Neil J. Gallagher, Jr.
Neil J. Gallagher, Jr.
Assistant U.S. Attorney

Date Submitted: May 21, 2007

<u>Certificate of Service</u>

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and mailed to all those not participating in ECF.

<u>/s/ Neil J. Gallagher, Jr.</u>
Neil J. Gallagher, Jr.