**CIVIL ACTION NO. 05-10239-RCL**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**HUSIE A. JOYNER, A/K/A "POOPIE" A/K/A "P", ET AL.**

**Defendants,**

## MOTION TO MODIFY POST INDICTMENT RESTRAINING ORDER

## INTRODUCTION

U.S. Bank National Association, As Trustee of CSFB ABS Trust Series Heat 2002-3, (hereinafter "US Bank") is the current holder of the first Mortgage on the property located at 27 Keith Avenue, Brockton, Massachusetts. The United States of America brought this action to prevent any transfer of the property located at 27 Keith Avenue, Brockton, MA (hereinafter the "Property"). The owner of record is Foster Earl. US Bank was in the process of foreclosing on the Property at the time the restraining order entered because the Mortgage loan was in default. US Bank requests that the Court modify the Restraining Order issued on November 21, 2005 to allow US Bank to proceed with its foreclosure action. The mortgage loan is due for the June 1, 2005 payment and the value of the Property in the current market is almost equal in value to the

total debt owed by Foster Earl to US Bank.  At this time there is minimal equity in the property to satisfy the debt owed to US Bank, and this minimal equity continues to erode.

Now comes US Bank, the holder of the first mortgage in connection with the property located at 27 Keith Avenue, Brockton, Massachusetts, in the above-captioned matter and files this Motion to Modify the Post Indictment Restraining Order in connection with the Property located at 27 Keith Avenue, Brockton, Massachusetts.

In support of said Motion, US Bank states as follows:

1.  US Bank is the holder of a Note given by Earl Foster dated June 28, 2002 in the amount of $168,750.00.   A true and accurate copy of the Note is attached hereto as Exhibit A.

2.  US Bank is the holder of the first mortgage given by Earl Foster dated June 28, 2002 in the amount of $168,750.00 affecting the property located at  27 Keith Avenue, Brockton, Massachusetts (the "Property") and recorded with the Plymouth County Registry of Deeds at Book 22359, Page 3 (the "Mortgage").   A true and accurate copy of the Mortgage is attached hereto as Exhibit B.

3.  The Property is the subject of the Court's Order freezing the assets of the Defendants in this matter.

4.  On December 19, 2005, US Bank filed its appearance and Verified Claim in this action.

5.  On February 1, 2006, the Court entered an Order for Interlocutory Sale of the Property.

6.     In April 2006, US Bank entered into an expedited settlement agreement with the United States. The United States has not sold the property because the record owner of the Property is not a defendant to the Federal Forfeiture action pending with this Court, and will not consent to said sale. A true and accurate copy of the Expedited Settlement Agreement is attached hereto as Exhibit "C".

7.     The Defendant is currently in default on the Mortgage held by US Bank.

8.     As of February 29, 2008, US Bank is owed approximately $232,346.42 to pay off its mortgage in full, however, a current broker's price opinion lists a suggested list price for the Property in the amount of $259,900.00 and a probable sales price of $250,000.00. True and accurate copies of the payoff statement and appraisal are attached hereto as Exhibits "D" and "E" respectively.

9.     US Bank seeks permission from the Court to take all actions necessary to comply with the statutory foreclosure requirements for the Commonwealth of Massachusetts including but not limited to publication of its Notice of Sale and sending notices of the scheduled foreclosure sale to the borrower and to all interested lienholders.

10.    The proceeds of the foreclosure sale will be used to pay off the outstanding debt owed by the Defendant to US Bank including all attorney's fees and costs incurred in connection with the foreclosure and all action taken in connection with the matter currently before the Court.

11. Following the foreclosure sale US Bank shall file a report with the Court advising of the sales price and provide an accounting of the application of funds.

12. If there are any remaining proceeds following the payment of the first mortgage held by US Bank, those funds will be remitted to the U.S. Attorney's Office in Boston, MA in the form of an attorney's IOLTA check or certified funds, made payable to the United States Marshals Service, to be distributed as ordered by this Court.

**WHEREFORE**, U.S. Bank National Association, As Trustee of CSFB ABS Trust Series Heat 2002-3, the holder of the first mortgage of record respectfully request that this Court:

1. Allow US Bank to take all actions necessary to comply with the statutory requirements for a Foreclosure Sale of the Property;

2. Allow US Bank to pay itself in full from the funds generated by the foreclosure of the Property; including payment of the attorney's fees and costs incurred in the foreclosure process and of obtaining a modification of this Court's Restraining Order;

3. Allow US Bank to deposit any remaining funds after satisfaction of its mortgage by remitting said funds to the U.S. Attorney's Office in Boston, MA in the form of an attorney's IOLTA check or certified funds, made payable to the United States Marshals Service, to be distributed as ordered by this Court ;

4. Schedule a hearing on this matter if needed; and

5. Grant such further relief as this Court deems just and proper.

Respectfully submitted,
**U.S. BANK NATIONAL ASSOCIATION, AS**
**TRUSTEE OF CSFB ABS TRUST SERIES**
**HEART 2002-3**
By its attorneys,

/s/ Veronica C. Viveiros
Veronica C. Viveiros, Esq.
BBO # 631233
HARMON LAW OFFICES, P.C.
P.O. Box 610389
150 California Street
Newton Highlands, MA 02461
(617) 558-8481

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)

This is to certify that I conferred with Assistant United States Attorney Kristina E. Barclay, counsel

for the United States in this matter, and she has assented to the relief requested herein.

Dated: July 1, 2008

/s/ Veronica C. Viveiros
Veronica C. Viveiros, Esq.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE:<br><br>HUSIE A. JOYNER, A/K/A "POOPIE"<br>A/K/A "P", ET AL. | CIVIL ACTION NO. 05-10239-RCL |

## CERTIFICATE OF SERVICE

I, Veronica C. Viveiros, hereby certify that true copies of the Motion to Modify Post Indictment Restraining Order and Certificate of Service were served on July 1, 2008 by using the CM/ECF system, to:

- **Michael C. Andrews**
  MCADMASS@aol.com

- **Victoria M. Bonilla-Argudo**
  vicky@lawgenie.com

- **James H. Budreau**
  budjim@aol.com

- **Thomas J Butters**
  butters@buttersbrazilian.com,messina@buttersbrazilian.com

- **Roger A. Cox**
  coxcox@bellatlantic.net

- **Carlos Jorge Dominguez**
  dmngzcarlos@aol.com

- **Christopher A. Edwards**
  cedwards@choate.com

- **Peter T. Elikann**
  peter@elikann.com

- **Matthew H. Feinberg**
  mattfein@feinberg-kamholtz.com,rgifford@feinberg-kamholtz.com

- **Neil J. Gallagher , Jr**
  neil.gallagher@usdoj.gov,usama.ecf@usdoj.gov

- **John M. Goggins**
  AttorneyGoggins@yahoo.com

- **George F. Gormley**
  gfgormley@aol.com

- **Harold H. Hakala**
  jbgnecco@hotmail.com

- **J. Thomas Kerner**
  thomas.kerner@comcast.net

- **Bruce G. Linson**
  brucelinson@earthlink.net

- **Diana K. Lloyd**
  dlloyd@choate.com,sspencer@choate.com

- **Eduardo A. Masferrer**
  masferrer@madefenders.com,Federal@madefenders.com

- **Peter B. Moores**
  pmoores@choate.com,bbruneau@choate.com

- **Raymond A. O'Hara**
  oharalaw@hotmail.com

- **Glen P Randall**
  grandall@randalllawoffices.com

- **Rosemary C. Scapicchio**
  scapicchio_attorney@yahoo.com

- **Michael R. Schneider**
  mrs@salsbergandschneider.com,mrs9@ix.netcom.com

- **Robert L. Sheketoff**
  sheketoffr@aol.com

- **Matthew D. Thompson**
  thompson@buttersbrazilian.com,messina@buttersbrazilian.com

- **Timothy G. Watkins**
  timothy_watkins@fd.org,barbara_bishop@fd.org,tgwatkins@comcast.net

- **Jennifer Hay Zacks**
  jennifer.zacks@usdoj.gov,usama.ecf@usdoj.gov,tracie.fernandes@usdoj.gov,kay-beth.whitten@usdoj.gov

/s/ Veronica C. Viveiros
Veronica C. Viveiros, Esq.

# ADJUSTABLE RATE NOTE

### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

June 28, 2002                    ANAHEIM, CA 92808
[Date]                                              [City]

27 KEITH AVENUE    BROCKTON, MA 02301
                                         [Property Address]

174578 0003772084  Note                    30915705

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 168,750.00    FREMONT INVESTMENT & LOAN
"Principal"), plus interest, to the order of the Lender. The Lender is                                    (this amount is called

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 12.300    %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on    August 1, 2002    .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    July 1, 2032    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    175 N. RIVERVIEW DRIVE, ANAHEIM CA 92808

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 1,774.85    . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR INDEX - Single Family - Freddie Mac UNIFORM INSTRUMENT    Form 3590 1/01

-815N (0008).01
VMP MORTGAGE - (800)521-7291
Page 1 of 4                    Initials: 



EXHIBIT
A

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A)    Change Dates**

The interest rate I will pay may change on the first day of **July 1, 2005**                    , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B)    The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)    Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding    **Six and Ninety-Nine Hundredths**                    percentage points (    **6.9900**    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)    Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    **15.300**                %, or less than    **12.3000**        %. Thereafter, my interest rate will never be increased or decreased on any subsequent Change Date by more than    **1.5000**                from the rate of interest I have been paying for the preceding period. My interest rate will never be greater than    **19.3000**            % or less than    **12.3000**        %.

**(E)    Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)    Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.    BORROWER'S RIGHT TO PREPAY

**•SEE PREPAYMENT RIDER ATTACHED HERETO AND MADE A PART HEREOF•**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Initials: _I. I._

### 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after
the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    6.0    %
of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain
date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest
that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by
other means.

**(D) No Waiver By Note Holder**

Even if, at a time I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note
Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me
for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for
example, reasonable attorneys' fees.

### 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by
delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note
Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class
mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different
address.

### 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this
Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also
obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or
endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under
this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of
the amounts owed under this Note.

### 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.
"Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the
right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note
Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note,
protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That
Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts
I owe under this Note. Some of those conditions are described as follows:

Form 3590 1/01

Initials: _____

-816N (0005).01    Page 3 of 4

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

*SEE PREPAYMENT RIDER ATTACHED HERETO AND MADE A PART HEREOF*

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
FOSTER EARL                     -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                -Borrower                                        -Borrower

[Sign Original Only]

815N (0005).01                        page 4 of 4                        Form 3590 1/01

Return To:
**FREMONT INVESTMENT & LOAN**
**P.O. BOX 14242**
**ORANGE, CA 92863**

Certified True Copy:

Paul B. Sibley

Prepared By:
**BARBARA LICON**

**6000034210**

——————————————— [Space Above This Line For Recording Data] —— · ———— · ——

# MORTGAGE



174578 0003772084  Mortgage  30915704

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated  June 28, 2002
together with all Riders to this document.
(B) "Borrower" is FOSTER EARL

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is  FREMONT INVESTMENT & LOAN

Lender is a  CORPORATION
organized and existing under the laws of  CALIFORNIA

**MASSACHUSETTS**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3022  1/01

-6(MA) (0005)
Page 1 of 15                          Initials: 
        VMP MORTGAGE FORMS - (800)521-7291      

EXHIBIT
B

Lender's address is
**175 N. RIVERVIEW DRIVE, ANAHEIM CA 92808**
Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated **June 28, 2002**
The Note states that Borrower owes Lender **One Hundred Sixty-Eight Thousand, Seven Hundred Fifty and No/100** ------------------------------
**(U.S. $ 168,750.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 1, 2032**. Dollars
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

-6(MA) (0005)                    Page 2 of 15                    Initials: _____                    Form 3022  1/01

(P) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the **County** [Type of Recording Jurisdiction] of **PLYMOUTH** [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART THEREOF

Parcel ID Number:  83-89
27 KEITH AVE                                which currently has the address of
BROCKTON                                                        [Street]
("Property Address"):                    [City] , Massachusetts  02301   [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(MA) (0005)                    Page 3 of 15         Initials: _J.C._         Form 3022  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of

Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied

to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the

Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations

-6(MA) (0005)                     Page 10 of 15                     Initials _____                     Form 3022  1/01

contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
FOSTER EARL                        -Borrower

_____

_____ (Seal)
                                   -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                                   -Borrower

**COMMONWEALTH OF MASSACHUSETTS,**

On this   28 th   day of   JUNE,   2002

FOSTER EARL

PLYMOUTH County ss:

, before me personally appeared

to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

**My Commission Expires:**

11/12/04

Notary Public

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                               )   CRIMINAL NO. 05-10239-RCL
        v.           )
                               )
HUSIE A. JOYNER,          )
     a/k/a "Poopie"     )
     a/k/a "P",         )
            Defendant.   )

## EXPEDITED SETTLEMENT AGREEMENT

IT IS HEREBY STIPULATED by and between plaintiff United States of America and the Petitioner, U.S. Bank National Association as Trustees of CSFB ABS Trust Series HEAT 2002-3, 3815 South West Temple, Salt Lake City, UT 84165 (hereinafter "U.S. Bank"), to compromise and settle U.S. Bank's claim with respect to the following Property:

   a.   Certain real property including all buildings, appurtenances, and improvements thereon, located at 27 Keith Avenue, Brockton, Massachusetts 02301 (deed recorded with the Plymouth Country Registry of Deeds in Book 20251, Page 345) (the "Keith Avenue Property").

This Expedited Settlement is entered into between the parties pursuant to the following terms:

1.   The parties to this Agreement hereby stipulate that any violations of 21 U.S.C. §853 involving the Keith Avenue Property occurred without the knowledge and consent of U.S. Bank.

2.   The United States agrees that upon sale of the property pursuant to an order of the Court, or upon sale of the property pursuant to entry by the Court of a Final Order of Forfeiture, the United States will not contest payment to U.S. Bank from the

EXHIBIT

C

proceeds of sale, after payment of outstanding taxes and expenses of custody and sale incurred by the United States' Marshals Service, the following:

    a.    any unpaid principal amount due to U.S. Bank in the amount of described in the Mortgage between Foster Earl, Jr. and Fremont Investment and Loan, dated June 28, 2002, which was recorded in the official records of the Plymouth County Registry of Deeds in Book 22359, Page 3, and attached hereto as Exhibit A;

    b.    all unpaid interest at the contractual (not default) rate under the above mortgage instrument[1].

3.    Payment to U.S. Bank is conditioned upon the United States' prevailing against any competing claims, including any claims by the property owner.

4.    The payments to U.S. Bank shall be in full settlement and satisfaction of all claims by U.S. Bank to the Keith Avenue Property, which was named in a United States' Bill of Particulars for Forfeiture of Assets, and filed with the District Court on or about September 22, 2005, and of any claims resulting from and relating to the seizure, detention, and forfeiture of the Property.

5.    Upon payment, U.S. Bank agrees to provide a discharge of mortgage in recordable form and hold harmless the United States, and any agents, servants, and employees of the United States,

---

[1] The government shall **not** be liable for any amount due U.S. Bank as listed in Paragraph 2(a) and (b) in excess of the sale price of the Keith Avenue Property, less the government's expenses, upon the sale of the Keith Avenue Property by the United States Marshals Service.

including, but not limited to, the United States Department of Justice, the United States Attorneys Office for the District of Massachusetts, the United States Drug Enforcement Administration, and the United States Marshals Service, as well as any State or local law enforcement agencies involved in the forfeiture of the Keith Avenue  Property, acting in their individual or official capacities, from any and all claims by U.S. Bank and its agents which currently exist or which may arise as a result of the government's action in connection with the Keith Avenue Property.

6.    As part of this settlement, U.S. Bank agrees not to pursue against the United States any other rights that they may have under the Mortgage, including but not limited to any right to foreclose upon and sell the property and any right to assess additional interest or penalties.

7.    U.S. Bank agrees to waive all attorneys' fees under 18 U.S.C. §2465.

8.    U.S. Bank agrees to notify the United States promptly if it learns of any condition that might make an interlocutory sale appropriate. Without limitation, U.S. Bank shall notify the United States at the end of the first payment cycle in which a payment is not made by the debtor under the terms specified in the note.  U.S. Bank further agrees to join in any motion by the United States for interlocutory sale of the property and any motions to remove occupants who fail to abide by the terms of an occupancy agreement.

U.S. Bank shall endorse such government motions within ten days of receipt of the motion.

9.    U.S. Bank understands and agrees that by entering into this Expedited Agreement of its interest in the Keith Avenue Property, they waive any rights to litigate further against the United States its interest in the Keith Avenue Property and to petition for remission or mitigation of the forfeiture.

10.    U.S. Bank understands and agrees that the United States reserves the right to void the expedited settlement agreement if, before payment of the mortgage or lien, the United States obtains new information that the mortgagee or lienholder is not an "innocent owner" or "bona fide purchaser" pursuant to the applicable forfeiture statutes.   The United States also reserves the right, in its discretion, to terminate the forfeiture at any time and release the subject property.   In either event, the Government shall promptly notify the mortgagee or lienholder of such action.   A discretionary termination of forfeiture shall not be a basis for any award of fees under 18 U.S.C. §2465.

11.    Upon payment of the sale proceeds to U.S. Bank, U.S. Bank agrees to provide a discharge of its mortgage to the United States and to further implement the terms of this settlement.   Each party agrees to bear its own costs and attorneys' fees.

12.    Payment to U.S. Bank pursuant to this settlement agreement is contingent upon a court-authorized interlocutory sale

4

of the Keith Avenue Property or forfeiture of the Keith Avenue Property to the United States, the United States' prevailing over any third-party claims, the court's entry of a final judgment of forfeiture, and sale of the Keith Avenue Property pursuant to the final judgment. The parties agree that any violation of any terms and conditions shall be construed as a violation of an order of the court.

U.S. BANK NATIONAL ASSOCIATION          THE UNITED STATES OF AMERICA
as Trustees of CSFB ABS TRUST           By Its Attorney
Series HEAT 2002-3                       Michael J. Sullivan,
By Its Attorney                          United States Attorney


_____          _____
Veronica C. Viveiros, Esquire           Jennifer H. Zacks
HARMON LAW OFFICES, PC                   Assistant U.S. Attorney
150 California Street                    1 Courthouse Way, Suite 9200
Newton, MA 02458                         Boston, MA 02210
(617) 558-8481                           (617) 748-3100



DATED:                                   DATED:

U.S. BANK NATIONAL ASSOCIATION
as Trustees of CSFB ABS TRUST
Series HEAT 2002-3
By Its Representative


_____
DIANE MITCHELL - SVP
SELECT PORTFOLIO SERVICING
ITS ATTORNEY-IN-FACT
3815 S. WEST TEMPLE
SALT LAKE CITY, UT 84115
DATED: 4-13-06

5

```
                                      PAYOFF STATEMENT
                                      Loan Number 0003772084

January 30, 2008
                                      Payment Due Date 06-01-05
This statement expires on: 02-29-08
                                         Requested by:
Select Portfolio Ser                     Troy Noble
```

```
Mortgagor Name/Property Address
Foster Earl
27 Keith Ave
Brockton MA 02301
```

```
        THE FOLLOWING AMOUNTS ARE SUBJECT TO FINAL VERIFICATION
               BASED ON THE RECEIPT OF FUNDS
Unpaid Principal Balance                 $        155,899.71
Interest Calculated To 02-29-08          $         53,860.85
Escrow/Impound Advance Balance           $         14,012.32
Late Charges Outstanding                 $            852.00
NSF Charges Outstanding                  $             80.00
Loan Level Advance Balance               $          8,160.72
Interest on Advances                     $            357.47
CREDITS DEDUCTED
    Unapplied Funds                      $            936.65-
```

```
Total Amounts Due Under Your Note and Mortgage  $    232,286.42
```

```
Per Diem (Daily Interest) $     51.68
```

```
Payoff Statement Fee                     $             50.00
Fax Fee                                  $             10.00
```

```
Total Other Fees Due                     $             60.00
TOTAL AMOUNT DUE                         $        232,346.42
                                              Page 1 of 4
```


EXHIBIT

1) The Payoff Statement assumes that payments made on your account have cleared your financial institution.  If a payment you made is returned you are still responsible to pay that amount, even though we accept the amount of your payoff.  Payments received within 30 days of the payoff application are subject to clearance by your financial Institution.

2) The amounts set forth in this Payoff Statement are subject to final verification.

3) This Payoff Statement expires and is void after 02-29-08.  You must obtain an updated WRITTEN statement from us if you want to pay off your loan after the expiration date.  Please allow up to 5 business days for us to provide you with an updated Payoff Statement (unless a shorter timeframe is required by state law).

4) If your loan documents indicate a prepayment fee on your account, it is included as part of the total amounts due for payoff.  If the prepayment fee is waivable, supporting documentation (final HUD1, grant deed, warranty deed, prepayment rider) must be faxed to (801) 269-4269 prior to the receipt of your payoff funds.  Upon receipt, the documents will be reviewed for final determination of waiving the prepayment fee.  If you have any questions about the prepayment fee, please contact us at (866) 222-3072.

5) Foreclosure / Bankruptcy:  If the account is currently subject to a pending foreclosure or bankruptcy action, the attorney fees and costs for services actually rendered that have been incurred with respect to this pending action have been included in the outstanding amounts due.  Additional attorney fees or costs associated with the servicing of your loan may continue to be incurred.  Due to the potential additional legal fees and costs, SPS limited the good through date on this quote to no more than ten (10) days from the date of this letter.  Please contact SPS's customer service number to obtain a new Payoff Statement if payoff funds are not received within ten (10) days.

6) If the amounts received are not sufficient to pay the account in full, we will return the payoff funds in the same manner as they were remitted.  Interest will continue to accrue at the daily (per diem) amount shown on the Payoff Statement and late charges may be incurred until sufficient funds are received to pay the account in full.  To avoid a short payoff, please confirm the actual payoff amount by calling (800) 258-8602.  A satisfaction/release of mortgage will not be recorded until all amounts due under the terms of your loan documents are received, unless applicable law requires otherwise.

7) Do not cancel or stop payment on any of your regularly scheduled monthly payments. Issuance of this Payoff Statement does not suspend your obligation to make your monthly payments under your loan agreement. You must continue to make your monthly payments when due up until the time your loan is paid in full. If the last regular monthly payment you sent to us is returned for insufficient funds, is dishonored due to a stop payment order, or payment is not made for any other reason, the amount required to payoff your loan may be higher than shown in this Payoff Statement.

8) Payoff amounts must be remitted in U.S. Dollars by money wire, certified or cashiers check, title company check or an attorney's trustee check. No personal or unofficial checks will be accepted. A copy of the Payoff Statement must accompany your payoff check. No deliveries should be made on Saturday, Sunday or legal holidays. Payoff funds received after 2:00 P.M. Mountain Time will be processed the following business day.

WIRING INSTRUCTIONS:                 MAILING INSTRUCTIONS
Select Portfolio Servicing, Inc.     Select Portfolio Servicing, Inc.
Salt Lake City, Utah                 Attn: Payoff Department
Attn: Payoff Department              3815 South West Temple
Routing/ABA No: 124001545            Salt Lake City, UT 84115-4412
Account No: 900900308
Retaining Account
For Credit to: Loan: 0003772084
              Name: Foster Earl

9) If you fail to make your regularly scheduled monthly mortgage payments within the timeframe stated on your monthly statement, the late charge disclosed on your monthly statement will be added to the payoff total. If your monthly payment is received but is returned unpaid by your bank, an NSF fee will be added to the payoff total to the extent permitted by applicable law.

10) If your monthly payments are automatically deducted from your banking account, these payments will continue to be withdrawn until the loan is paid in full, or unless written cancellation instructions are received in our office no later than 15 days prior to the payment due date.

11) Escrow Account: If you have an escrow account with us, issuance of this Payoff Statement does not alter our responsibility to pay taxes and insurance from the escrow account. If a bill for these items is received prior to the receipt of payoff funds, we will pay them from the escrow account. Select Portfolio Servicing, Inc. is not responsible for private agreements between the mortgagor and a third party with regard to the disbursement of escrow funds. If funds have accumulated in the escrow account, and if we have been required to pay interest on such funds as provided by state law, interest will be paid to the date the escrow closes. Any deficiencies in the escrow account will be collected at payoff. Any excess funds in the escrow account will be refunded approximately 14 days after the payoff is

complete.  If lender placed insurance has been charged to the escrow account prior to loan payoff, the full amount will be required to pay off the loan.  If appropriate evidence of insurance is received, the applicable refund will be issued to the mortgagee of record within 4-6 weeks.  Any escrow balance will be refunded after payoff, provided the last payment applied to the account has cleared the institution on which it was drawn.

12) Please provide the proper forwarding address to ensure receipt of applicable escrow refunds, cancelled documents, and annual tax/ interest statements.  If a forwarding address is not provided, all correspondence will be mailed to the consumers last known address.

13) If you have any questions, please contact our Customer Service Department, at (800) 258-8602, Monday through Friday, between the hours of 7 am and 8 pm Eastern Time.


Esta carta contiene informacion importante concerniente a sus derechos. Por favor, hagala traducir. Nuestros representantes bilingues estan a su disposicion para contestar cualquier pregunta llamando al telefono 1-800-831-0118 y marque la opcion 2.


Page 4 of 4

XP112 032/HH1

## Select Portfolio Servicing, Inc.

**PRE-FC**

### Competitive Market Analysis
**FOR AGENT REFERENCE ONLY, BPO MUST BE COMPLETED ONLINE – www.selectreo.net**

Loan Number: 0003772084    Asset Manager: Doyle Melville

Interior Access: ☐ Yes ☒ No
Debtor: Teisha Hall
Property Street Address: 27 Keith Ave
City: Brockton    County: Plymouth    State: MA    Zip: 02301

Property Tax ID: 083089
Delinquent Taxes: $0.00
Flood Zone: ☐ Yes ☒ No
City/Code Violations or Municipal Liens;(if yes explain below): No

Monthly HOA Dues: $0.00
Prior Listing History: (please attach MLS printouts)
List Price: $409900    List Date: 11/16/2005    DOM: 12
Prior Transfer Amount $297,000.00    Date: 01/16/2007

Info: Broker Name: Curtis Howe    Phone: 617-2129829
Number of competitive listings in immediate area:

**Property Type**
☒ Single Family
☐ Condominium
☐ Townhouse
☐ Row
☐ 2, 3, 4, Family
☐ PUD
☐ Manufactured/Mobile
☐ Co-Op
☐ Land Only
☐ Other

**Occ. Status**
☒ Vacant
☐ Occupied

**Predominant Occupancy**
☐ Owner _____ %
☐ Tenant _____ %
☒ Vacant _____ %100

**Condition**
☒ Good
☐ Average
☐ Fair
☐ Poor

**Market Location**
☒ Urban
☐ Suburban
☐ Rural
☐ Seasonal

**Economic Trends**
☐ Shortage
☐ In Balance
☒ Over Supply

**Values**
☐ Stable
☒ Declining
☐ Appreciating

**Typical Market Time**
☐ Under 90 days
☒ 90-180 days
☐ Over 180 days

**Probable Buyer**
☐ 1st Time
☒ Move-up Owner
☐ Investor

**Probable Finance**
☐ Cash
☒ Conventional
☐ FHA
☐ VA
☐ Other

Comments on property and surrounding area:

Large single family colonial in average condition, with natural cedar shingle siding, asphalt shingle roof, detached garage in poor condition, in-ground pool (covered) in fair condition. The interior is in good condition with the exception of ceiling damage in the mud room and a 2nd floor electrical panel. The rooms, kitchen, and baths, have high end fixtures, counters, and appliances. The neighborhood consists of older, average, single and multifamily homes.

### REPAIR ESTIMATES
**(List repairs needed and estimated cost to bring the property to minimum loan standards)**

| Interior | | Exterior | |
|---|---|---|---|
| Paint | $100.00 | Paint | $ |
| Floor Coverings | $ | Roof | $500.00 |
| Mechanicals | $700.00 | Termite/Dry Rot | $ |
| Interior Upgrades | $750.00 | Structural | $ |
| Clean Up | $ | Clean Up | $1000.00 |
| Other | $ | Other   Garage repairs | $3000.00 |

Estimated Repair Totals: $6050.00
**Include photos of all repairs listed along with a photo of the furnace and electrical.**

**(90-Day Price)**

| | AS IS | Repaired |
|---|---|---|
| Suggested List Price: | $259,900.00 | $265,900.00 |
| Probable Sales Price: | $250,000.00 | $255,000.00 |

reopen& rev 11



**EXHIBIT**
**E**

## Select Portfolio Servicing, Inc.

Provide one Comparable Sales that supports the estimated repaired value.
0008295370

### COMPARABLE SALES (less than six months old)

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 27 Keith Ave, Brockton, M | 71 S Leyden St, Brock | 270 Belmont Ave, Brock | 160 Brookside Ave, Brockton |
| Prox. to Subject | | 0.49 miles | 1.5 miles | 0.60 miles |
| List Price | $ | $209,900.00 | $274,900.00 | $289,900.00 |
| Price Sold | $ | $209,000.00 | $260,000.00 | $295,000.00 |
| DOM | | 108 | 36 | 54 |
| Date Sold | | 07/31/2007 | 08/31/2007 | 08/10/2007 |
| Concessions | $ | $0.00 | $5000 | $8000.00 |
| Financing | ☐Cash  X☐Financed | ☐Cash  X☐Financed | ☐Cash  X☐Financed | ☐Cash  X☐Financed |
| Lot Size | 10019sf | 6970sf | 7405sf | 10019sf |
| Property Type | SFR Detached | SFR Detached | SFR Detached | SFR Detached |
| Year Built | 1889 | 1910 | 1888 | 1890 |
| Condition | ☐Good  X☐Average  ☐Fair  ☐Poor | ☐Good  X☐Average  ☐Fair  ☐Poor | ☐Good  X☐Average  ☐Fair  ☐Poor | X☐Good  ☐Average  ☐Fair  ☐Poor |
| Total Room Count | Total/Bdrms/Baths 8/3/1.5 | Total/Bdrms/Baths 7/4/1 | Total/Bdrms/Baths 9/5/1.5 | Total/Bdrms/Baths 7/3/1.5 |
| Total Sq.Ft. | Sq. Ft. 2550 | Sq. Ft. 1901 | Sq. Ft. 2266 | Sq. Ft. 2092 |
| Basement | X☐Full  ☐Part  ☐None | X☐Full  ☐Part  ☐None | X☐Full  ☐Part  ☐None | X☐Full  ☐Part  ☐None |
| Basement Finish | ☐Full Finish  ☐Part Finish  X☐No Finish | ☐Full Finish  ☐Part Finish  X☐No Finish | ☐Full Finish  ☐Part Finish  X☐No Finish | ☐Full Finish  X☐Part Finish  ☐No Finish |
| Garage/Carport | 2 Car Detached | 2 Car Detached | None | 1 Car Detached |
| Amenities/Extras | IGPool, fence, porch | Porch | Porch, deck, shed, fence | Porch, encl porch, encl p |

Comments:
Comp 1: Inferior to subject based upon smaller size, lesser amenities. comp has newer roof, garage roof, vinyl siding, heat system, window
Comp 2: Comparable to subject based upon condition, size, age, and similar amenities. Comp has no pool, is in a better location.
Comp 3: Superior to subject based upon condition, location, and curb appeal.

It is considered unacceptable to leave fields blank unless otherwise noted on the following page.

### COMPARABLE LISTINGS

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 27 Keith Ave, Brockton, M | 98 French Ave, Brock | 22 Bolton Pl, Brockton | 190 Plain St, Brockton |
| Prox. to Subject | | 0.47 miles | 1.4 miles | 0.80 miles |
| List Price | $ | $259,900.00 | $299,900.00 | $345,000.00 |
| List Date | | 08/17/2007 | 05/01/2007 | 06/12/2007 |
| Lot Size | 10019sf | 7841sf | 6098sf | 11326sf |
| Property Type | SFR Detached | SFR Detached | SFR Detached | SFR Detached |
| Year Built | 1889 | 1912 | 1900 | 1870 |
| Condition | ☐Good  X☐Average  ☐Fair  ☐Poor | ☐Good  X☐Average  ☐Fair  ☐Poor | ☐Good  X☐Average  ☐Fair  ☐Poor | X☐Good  ☐Average  ☐Fair  ☐Poor |
| Total Room Count | Total/Bdrms/Baths 8/3/1.5 | Total/Bdrms/Baths 7/4/1.5 | Total/Bdrms/Baths 9/5/2 | Total/Bdrms/Baths 10/5/2 |
| Total Sq.Ft. | Sq. Ft. 2550 | Sq. Ft. 2091 | Sq. Ft. 2659 | Sq. Ft. 2354 |
| Basement | X☐Full  ☐Part  ☐None | X☐Full  ☐Part  ☐None | X☐Full  ☐Part  ☐None | X☐Full  ☐Part  ☐None |
| Basement Finish | ☐Full Finish  ☐Part Finish  X☐No Finish | ☐Full Finish  ☐Part Finish  X☐No Finish | ☐Full Finish  X☐Part Finish  ☐No Finish | ☐Full Finish  ☐Part Finish  X☐No Finish |
| Garage/Carport | 2 Car Detached | 1 Car Detached | 1 Car Detached | 2 Car Detached |
| Amenities/Extras | IGPool fence, porch | Porch, deck, Fence | Deck | Porch, encl porch, deck, patio, fence |

Comments:

Comp 1: Inferior to subject based upon smaller size and lesser amenities. Comp is in a better location, garage is in better condition.
Comp 2: Comparable to subject based upon condition and size. Comp has in-law apt on 2nd floor, partially finished basement.
Comp 3: Superior to subject based upon overall condition, higher room counts, and superior landscaping.

Completed by:    John Schjolden                    Company:    NOBLE PROPERTIES
Address: 1654 Main Street WEYMOUTH, MA 02190
Date:                    Distance from office to subject property: 11 mi
Telephone#:    7813405726                    Fax #    7813405986

*Please include copies of the MLS printouts of the Comparable Sales and Listings.

reopsefc rev 11

**Select Portfolio Servicing, Inc.**



